M. TABOADA & Co. ET AL., Plaintiffs and Appellants, v. PRUDENCIO RIVERA MARTÍNEZ, COMMISSIONER OF LABOR OF PUERTO RICO, Defendant and Appellee.

No. 7311. Argued January 13, 1937.—Decided April 13, 1937.

*Leopoldo Feliú* for appellants. *B. Fernández García, Attorney General, Luis Janer, Deputy Attorney General,* and *Pedro Santana, Attorney of the Department of Labor,* for appellee.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the court.

The "Centro de Detallistas de Provisiones de Puerto Rico," an association organized in accordance with the Act to incorporate associations not for pecuniary profits, M. Taboada & Co., and Fernández Hermano and Co., two mercantile partnerships organized in accordance with the Code of Commerce, filed a complaint in the District Court of San Juan under the provisions of Act No. 47 relative to Judgments and Declaratory Decrees of 1931 (Session Laws, p. 378), praying that the court declare as unconstitutional and void Act No. 49 of 1935 (Sess. Laws (2), p. 538) to regulate

the working hours of persons employed in commercial and industrial establishments and in other lucrative businesses, and for other purposes.

The defendant Prudencio Rivera Martínez, Commissioner of Labor, demurred to the complaint on the grounds of misjoinder of parties plaintiff, lack of capacity of "Centro de Detallistas" to sue, nonjoinder of parties defendant, and want of facts sufficient to constitute a cause of action.

The district court decided the demurrer—extensively and carefully stating through Judge de Jesús the reasons for its conclusions—by sustaining the grounds of misjoinder of parties plaintiff, lack of capacity of "Centro de Detallistas" to sue, and want of facts sufficient to constitute a cause of action, and overruled the ground of nonjoinder of parties defendant.

The "Centro de Detallistas" took no further steps in the action. The plaintiff partnership filed an amended complaint. The defendant again demurred to it on the ground of insufficiency, and the court, considering that the amended complaint was substantially the same as the original pleading with respect to the grounds alleged to establish the unconstitutionality of the act, for the reasons previously stated, sustained the demurrer and dismissed the complaint, without special imposition of costs.

Feeling aggrieved by that decision, the plaintiffs appealed to this Supreme Court, and have assigned in their brief two errors, as follows:

"I.—That the lower court erred in declaring, concluding, and deciding that Act No. 49 of August 7, 1935, already cited, is constitutional and valid.

"II.—That said court also erred in rendering a judgment dismissing the amended complaint of these appellants."

■■ Both assignments will be considered and decided together.

The act which is sought to be declared void, reads as follows (Special Session Laws of 1935, p. 538):

"An Act to regulate the working hours of persons employed in commercial and industrial establishments and in other lucrative businesses, and for other purposes.

"*Be it enacted by the Legislature of Puerto Rico:*

"Section 1.—No person shall be employed or shall be permitted to work in any commercial, industrial, or agricultural establishment or in any other lucrative business more than eight (8) hours during any natural day, except in case of some extraordinary event or emergency caused by fire, famine, or flood, or danger to life, property, or public safety or health or under any other special circumstance, provided that the Governor of Puerto Rico, on recommendation of the Commissioner of Labor, subsequently declares that the provisions of this Act shall not apply in these excepted cases and that therefore the violations committed were excusable; *Provided,* that the limit of eight (8) hours established by this section, in all normal labor aside from the exceptions already noted, may be extended to a period that shall not exceed nine (9) hours during any natural day, on condition that every person so employed for wages, by the day, or otherwise, for more than eight (8) hours during any natural day, shall be paid for the work that he does during such extra time at a rate double that of the wages being paid him by the hour for the preceding work.

"Section 2.—In cases where there is danger of losing a crop for lack of laborers, or when there is not sufficient personnel available to dispatch a shipment of fruit or other perishable product, the Governor of Puerto Rico, on recommendation of the Commissioner of Labor, may, in such specific cases, temporarily suspend the effects of this Act in regard to the limitation of hours, but not in regard to the double wages established for the hours worked in excess of the eight (8) working hours a day that are fixed by this Act.

"Section 3.—Every employer shall affix in a visible place in the establishment, plant, property, or place of work, as the case may be, a printed notice stating the number of hours of work required daily of the employees during each day of the week, the hours for beginning and ending work, and the hour when the period for eating begins and ends; *Provided,* that the time set for eating shall not be less than one hour.

"In commercial, industrial, or agricultural establishments, or in those devoted to other lucrative businesses where persons are employed at alternate hours during all the days of the week, a special notice shall be affixed, stating the name of each one of the employees and the hours he works on each day of the week.

"The hours fixed in the notices shall constitute *prima facie* evidence that such working hours in each establishment shall constitute the divisions of the legal day's work.

"Every employer shall be obliged to ask for the printed models of these notices which shall be furnished gratis by the Department of Labor.

"Section 4.—In this Act, unless it is otherwise deduced from the context, the following definitions of words and phrases herein shall be accepted:

"*Employer* includes every natural or artificial person and the manager, superintendent, foreman, *mayordomo,* or representative of said natural or artificial person;

"*Lucrative occupation* includes all work or labor in factories, mills, centrales, machine shops, or establishments or places of any kind where there is a machine factory or enterprise, and in warehouses, stores, establishments, or places of any kind where mercantile transactions are carried on; on farms, estates, ranches, or places of any kind where horticultural or grazing enterprises are carried on and in all mining or fishing enterprises, or enterprises of any other kind, whether industrial, commercial, or agricultural;

"*Establishment* includes every building, factory, shop, store, or place of a similar character, in which any lucrative occupation is engaged in;

"*Plantation* includes every estate, ranch, or other parcel of land where any lucrative occupation is carried on.

"Section 5.—The Department of Labor is hereby authorized and directed to carry out the provisions of this Act, to prosecute violations hereof, to summon witnesses, to administer oaths and to take declarations, to compel the presentation of books, pay rolls, documents, and any other evidence and to visit and examine, through its chief or such assistants as he may designate, the buildings of any establishment or farm referred to in this Act.

"In performing the duties imposed upon it by this section, it may use the services of the police force, the district attorneys, the municipal judges or the justices of the peace, and the marshals of all the courts.

"Section 6.—The Commissioner of Labor, with the approval of the Governor of Puerto Rico, shall determine what constitutes an *emergency,* an *extraordinary event,* a *special circumstance,* or any other condition justifying the temporary suspension of any of the provisions of this Act in accordance with the preceding sections hereof.

"Section 7.—This Act shall not affect or invalidate in any manner the provisions in force of Act No. 80, approved May 5, 1931, and amended April 15, 1935, in regard to the granting of permits by the Commissioner of Labor to work extra hours in the finishing of urgent or necessary works that must be done within a specified time in shops, factories, or any industrial, commercial, or agricultural establishment or in regard to the payment of double compensation for extra hours that is fixed therein. Neither shall this Act diminish the scope or modify or repeal in any way the provisions of Act No. 54, approved April 28, 1930, which amends Section 553 of the Penal Code of Puerto Rico, which Act is hereby declared to be in full force and effect. Nor shall the provisions of Act No. 73, 'To regulate the work of women and children and to protect them against dangerous occupations,' approved June 21, 1919, and amended on April 24, 1930, be affected or invalidated, said Act being also declared to be in full force and effect.

"Section 8.—Every employer violating this Act or any section or provision hereof shall be guilty of a misdemeanor and shall be punished by a fine that shall be not less than twenty-five (25) dollars nor more than one hundred (100) dollars, or by imprisonment in jail for a term of not less than five (5) days nor more than thirty (30) days, or by both penalties, in the discretion of the court; in subsequent cases there shall be imposed a fine of not less than one hundred (100) dollars nor more than one thousand (1,000) dollars, or imprisonment in jail for a term of not less than thirty (30) days nor more than ninety (90) days, or both penalties, in the discretion of the court.

"Section 9.—All laws or parts of laws in conflict herewith are hereby repealed.

"Section 10.—This Act shall take effect ninety days after its approval.

"*Approved, August 7, 1935.*"

And the charge of unconstitutionality is based substantially on seven grounds, to wit:

1. That the limitation provided by section 1 of said act impairs the obligation of the contract already entered into between the plaintiffs with their employees and amounts to a limitation of the freedom to contract, violating section 2, paragraphs 1, 5, and 9 of our Organic Act, and section

1 of the Fourteenth Amendment to the Constitution of the United States of America.

2. That the said section 1 contains a delegation to the Executive of powers and functions belonging to the Judiciary, and violates the provisions of the Organic Act and of the Constitution relative to the distribution of governmental powers.

3. That the said section 1 violates the guaranty of the equal protection of the laws provided in section 2 of the Organic Act and in section 1 of the Fourteenth Amendment to the Constitution, in so far as it deprives the plaintiff of the protection of the judicial power and of the substantive and adjective laws which protect the rights of the citizens.

4. That the above grounds of unconstitutionality numbered 2 and 3 apply to section 6 of the act in so far as the same provides that the Commissioner of Labor, with the approval of the Governor, shall determine what constitutes an "emergency," an "extraordinary event," and a "special circumstance."

5. That section 8 defines and punishes a new crime without any mention thereof being made in the title of the act, thereby violating the provisions of section 34 of the Organic Act.

6. That the application of the provisions of section 1 to all employees, in so far as it comprises the plaintiffs, which are mercantile firms, constitutes an excessive and arbitrary exercise of the police power.

7. That inasmuch as punishment by fine or imprisonment is established, the plaintiffs, which are mercantile partnerships, are in danger of being deprived of their property without due process of law.

In support of their contentions the appellants cite in the first place the case of *Lochner* v. *New York,* 198 U.S. 45. In said case the Supreme Court of the United States, by a majority of only five of its justices, declared unconstitutional a statute of the State of New York which prohibited persons

employed in bakeries and confectionery establishments to work more than ten hours a day, the constitutionality of which act had been sustained by the Court of Appeals of that State. Mr. Justice Harlan, Mr. Justice White, and Mr. Justice Day dissented, the first-named justice delivering an opinion in which his colleagues concurred. Mr. Justice Holmes also dissented and stated his reasons separately.

The opinion of the Court was delivered by Mr. Justice Peckham. Lochner was found guilty of a violation of section 110 of the act regulating the working hours of the State of New York, which provides:

"Section 110.—*Hours of labor in bakeries and confectionery establishments.*—No employé shall be required or permitted to work in a biscuit, bread or cake bakery or confectionery establishment more than sixty hours in any one week, or more than ten hours in any one day, unless for the purpose of making a shorter work day on the last day of the week; nor more hours in any one week than will make an average of ten hours per day for the number of days during such week in which such employé shall work."

The opinion, which presents a careful study of all the questions involved, ends as follows:

"It is manifest to us that the limitation of the hours of labor as provided for in this section of the statute under which the indictment was found, and the plaintiff in error convicted, has no such direct relation to and no such substantial effect upon the health of the employé, as to justify us in regarding the section as really a health law. It seems to us that the real object and purpose were simply to regulate the hours of labor between the master and his employés (all being men, *sui juris*), in a private business, not dangerous in any degree to morals or in any real and substantial degree, to the health of the employés. Under such circumstances the freedom of master and employé to contract with each other in relation to their employment, and in defining the same, cannot be prohibited or interfered with, without violating the Federal Constitution.

"The judgment of the Court of Appeals of New York as well as that of the Supreme Court and of the County Court of Oneida County must be reversed and the case remanded to the County Court for further proceedings not inconsistent with this opinion."

Mr. Justice Harlan in his dissenting opinion also considered the questions at issue, and said in part:

"Granting then that there is a liberty of contract which cannot be violated even under the sanction of direct legislative enactment, but assuming, as according to settled law we may assume, that such liberty of contract is subject to such regulations as the State may reasonably prescribe for the common good and the well-being of society, what are the conditions under which the judiciary may declare such regulations to be in excess of legislative authority and void? Upon this point there is no room for dispute; for, the rule is universal that a legislative enactment, Federal or state, is never to be disregarded or held invalid unless it be, beyond question, plainly and palpably in excess of legislative power. In *Jacobson* v. *Massachusetts, supra,* we said that the power of the courts to review legislative action in respect of a matter affecting the general welfare exists *only* 'when that which the legislature has done comes within the rule that if a statute purporting to have been enacted to protect the public health, the public morals or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law'—citing *Mugler* v. *Kansas,* 123 U. S. 623, 661; *Minnesota* v. *Barber,* 136 U. S. 313, 320; *Atkin* v. *Kansas,* 191 U. S. 207, 223. If there be doubt as to the validity of the statute, that doubt must therefore be resolved in favor of its validity, and the courts must keep their hands off, leaving the legislature to meet the responsibility for unwise legislation. If the end which the legislature seeks to accomplish be one to which its power extends, and if the means employed to that end, although not the wisest or best, are yet not plainly and palpably unauthorized by law, then the court cannot interfere. In other words, when the validity of a statute is questioned, the burden of proof, so to speak, is upon those who assert it to be unconstitutional. *McCulloch* v. *Maryland,* 4 Wheat. 316, 421.

"Let these principles be applied to the present case.

"  *        *        *        *        *        *        *

"It is plain that this statute was enacted in order to protect the physical well-being of those who work in bakery and confectionery establishments. It may be that the statute had its origin, in part, in the belief that employers and employés in such establishments were not upon an equal footing, and that the necessities of the latter often compelled them to submit to such exactions as unduly taxed

their strength. Be this as it may, the statute must be taken as expressing the belief of the people of New York that, as a general rule, and in the case of the average man, labor in excess of sixty hours during a week in such establishments may endanger the health of those who thus labor. Whether or not this be wise legislation it is not the province of the court to inquire. Under our systems of government the courts are not concerned with the wisdom or policy of legislation. So that in determining the question of power to interfere with liberty of contract, the court may inquire whether the means devised by the State are germane to an end which may be lawfully accomplished and have a real or substantial relation to the protection of health, as involved in the daily work of the persons, male and female, engaged in bakery and confectionery establishments. But when this inquiry is entered upon I find it impossible, in view of common experience, to say that there is here no real or substantial relation between the means employed by the State and the end sought to be accomplished by its legislation. *Mugler* v. *Kansas, supra*. Nor can I say that the statute has no appropriate or direct connection with that protection to health which each State owes to her citizens, *Patterson* v. *Kentucky, supra;* or that it is not promotive of the health of the employés in question, *Holden* v. *Hardy, Lawton* v. *Steele, supra;* or that the regulation prescribed by the State is utterly unreasonable and extravagant or wholly arbitrary, *Gundling* v. *Chicago, supra.* Still less can I say that the statute is, beyond question, a plain, palpable invasion of rights secured by the fundamental law. *Jacobson* v. *Massachusetts, supra.*

"    *        *        *        *        *        *        *

"Statistics show that the average daily working time among workingmen in different countries is, in Australia, 8 hours; in Great Britain, 9; in the United States, 9¾; in Denmark, 9¾; in Norway, 10; Sweden, France and Switzerland, 10½; Germany, 10¼; Belgium, Italy and Austria, 11; and in Russia, 12 hours.

"We judicially know that the question of the number of hours during which a workman should continuously labor has been, for a long period, and is yet, a subject of serious consideration among civilized peoples, and by those having special knowledge of the laws of health . . .

"    *        *        *        *        *        *        *

"I take leave to say that the New York statute, in the particulars here involved, cannot be held to be in conflict with the Fourteenth Amendment, without enlarging the scope of the Amendment far be-

yond its original purpose and without bringing under the supervision of this court matters which have been supposed to belong exclusively to the legislative departments of the several States when exerting their conceded power to guard the health and safety of their citizens by such regulations as they in their wisdom deem best. Health laws of every description constitute, said Chief Justice Marshall, a part of that mass of legislation which 'embraces everything within the territory of a State, not surrendered to the General Government; all which can be most advantageously exercised by the States themselves.' *Gibbons* v. *Ogden,* 9 Wheat. 1, 203. A decision that the New York statute is void under the Fourteenth Amendment will, in my opinion, involve consequences of a far-reaching and mischievous character; for such a decision would seriously cripple the inherent power of the States to care for the lives, health and well-being of their citizens. Those are matters which can be best controlled by the States. The preservation of the just powers of the States is quite as vital as the preservation of the powers of the General Government.''

The above was written in 1904. From that time to the present, there has been continuous progress. We quote the following excerpts from appellee's brief:

''When the World War ended, in the Treaty of Peace signed in Versailles by the principal powers of the world, when the League of Nations was instituted as a means to preserve universal peace, it was declared that it can not be based in anything else but in social justice, and 'whereas conditions of labour exist involving such injustice, hardship, and privation to large numbers of people as to produce unrest so great that the peace and harmony of the world are imperilled; and an improvement of those conditions is urgently required, as, for example, by the regulation of the hours of work, including the establishment of a maximum working day and week, etc.,' and 'recognizing that the well-being, physical, moral, and intellectual, of industrial wage-earners is of supreme international importance,' the International Labour Office was created and the High Contracting Parties state in section 427 of the famous Treaty:

'' 'They recognize that differences of climate, habits and customs, of ·economic opportunity and industrial tradition, make strict uniformity in the conditions of labour difficult of immediate·attainment. But, holding as they do, that labour should not be regarded merely as an article of commerce, they think that there are methods and

principles for regulating labour conditions which all industrial communities should endeavour to apply, so far as their special circumstances will permit.

" 'Among these methods and principles, the following seem to the High Contracting Parties to be of special and urgent importance:

" '*First*.—The guiding principle above enunciated that labour should not be regarded merely as a commodity or article of commerce.

" '*Second*.—The right of association for all lawful purposes by the employed as well as by the employers.

" '*Third*.—The payment to the employed of a wage adequate to maintain a reasonable standard of life as this is understood in their time and country.

" '*Fourth*.—The adoption of an eight-hours' day or a forty-eight hours' week as the standard to be aimed at where it has not already been attained.

" '*Fifth*.—The adoption of a weekly rest of at least twenty-four hours, which should include Sunday whereever practicable.

" '*Sixth*.—The abolition of child labour and the imposition of such limitations on the labour of young persons as shall permit the continuation of their education and assure their proper physical development.

" '*Seventh*.—The principle that men and women should receive equal remuneration for work of equal value.

" '*Eighth*.—The standard set by law in each country with respect to the conditions of labour should have due regard to the equitable economic treatment of all workers lawfully resident therein.

" '*Ninth*.—Each State should make provision for a system of inspection in which women should take part, in order to ensure the enforcement of the laws and regulations for the protection of the employed.'

"In the first annual meeting of the International Labour Conference held in Washington in 1919, with the attendance of all the nations which signed the Treaty of Versailles and of those which later on adhered to the Covenant of the League of Nations, an international treaty adopting the eight hours' day and the forty-eight hours' week was approved. Twenty-two nations have already ratified said treaty, among them: Germany, Argentine, Australia, Austria, Belgium, Brazil, Canada, Czechoslovakia, Chile, Colombia, Spain, France, Italy, Holland, Poland, and Sweden. (International Labour Review, Vol. XII, No. 1, July 1935.)

"The eight hours' day is also in force in the following countries which have approved special statutes regarding this matter: Bulgaria, China, Cuba, Dominican Republic, Estonia, Greece, Hungary, India, Latonia, Lithuania, Ecuador, Mexico, Nicaragua, New Zealand, Portugal, Rumania, Uruguay, Venezuela, and Jugoslavia.

"In the XIX meeting of the International Labour Conference held in Geneva this year, a project of agreement was approved wherein 'the principle of the 40-hours week, applied in such a manner that it will not imply a diminution of the laborers' standard of life' was embodied.

"Therefore, the prevailing tendency of the present times in the more progressive countries of the world is to limit to 40 hours the working week . . ."

The Supreme Court itself implicitly recognized twelve years later that the opinion of the minority in the said case of *Lochner, supra,* was correct, when it declared constitutional an act of the State of Oregon, section 2 of which reads as follows:

"Section 2.—No person shall be employed in any mill, factory or manufacturing establishment in this State more than ten hours in any one day, except watchmen and employees when engaged in making necessary repairs, or in case of emergency, where life or property is in imminent danger; *provided, however,* employees may work overtime not to exceed three hours in any one day, conditioned that payment be made for said overtime at the rate of time and one-half of the regular wage."

Said act was attacked as contrary to the Fourteenth Amendment to the Constitution on the grounds that it impaired the obligation of contracts, violated the property rights, and constituted class legislation, as now the Puerto Rican statute is attacked. The State Supreme Court dismissed the action and sustained the constitutionality of the act, and when the case was taken on appeal before the Federal Supreme Court, the latter, without mentioning the *Lochner* case, *supra,* affirmed the judgment appealed from.

The opinion of the court was given as in the *Lochner* case, *supra,* by a majority of five judges, the Chief Justice

and Justices Van Devanter and McReynolds dissenting. Mr. Justice Brandeis took no part in the decision of the case. The majority was formed by Justices McKenna, Holmes, Day, Pitney, and Clarke, and the opinion was delivered by the first-named justice. From it we take the following:

"But we need not cast about for reasons for the legislative judgment. We are not required to be sure of the precise reasons for its exercise or be convinced of the wisdom of its exercise. *Rast* v. *Van Deman & Lewis Co.*, 240 U. S. 342, 365. It is enough for our decision if the legislation under review was passed in the exercise of an admitted power of government; and that it is not as complete as it might be, not as rigid in its prohibitions as it might be, gives perhaps evasion too much play, is lighter in its penalties than it might be, is no impeachment of its legality. This may be a blemish, giving opportunity for criticism and difference in characterization, but the constitutional validity of legislation cannot be determined by the degree of exactness of its provisions or remedies. New policies· are usually tentative in their beginnings, advance in firmness as they advance in acceptance. They do not at a particular moment of time spring full-perfect in extent or means from the legislative brain. Time may be necessary to fashion them to precedent customs and conditions and as they justify themselves ·or otherwise they pass from militancy to triumph or from question to repeal.

"But passing general considerations and coming back to our immediate concern, which is the validity of the particular exertion of power in the Oregon law, our judgment of it is that it does not transcend constitutional limits.

"This case is submitted by plaintiff in error upon the contention that the law is a wage law not an hours of service law, and he rests his case on that contention. To that contention we address our decision and do not discuss or consider the broader contentions of counsel for the State that would justify the law even as a regulation of wages.

"There is a contention made that the law, even regarded as regulating hours of service, is not either necessary or useful 'for preservation of the health of employés in mills, factories and manufacturing establishments.' The record contains no facts to support the contention, and against it is the judgment of the legislature and the Supreme Court, which said: 'In view of the well-known fact that

the custom in our industries does not sanction a longer service than 10 hours per day, it cannot be held, as a matter of law, that the legislative requirement is unreasonable or arbitrary as to hours of labor . . .' '' *Bunting* v. *Oregon,* 243 U. S. 426, 437.

That the *Lochner* case was thereby virtually overruled has been well understood by judges and jurists. From the opinion of the district court we take the following:

"Undoubtedly the case of *Bunting* v. *Oregon,* overruled the prior case of *Lochner* v. *New York.* It was thus understood by Chief Justice Taft when he said that the *Lochner* case had been overruled *sub silentio* by that of *Bunting* v. *Oregon.*

"Dean Burdock of the Law School of Cornell University, in his recent work 'The Law of the American Constitution,' page 581, referring to the *Bunting* v. *Oregon* case, *supra,* says:

" 'This statute was held constitutional in a brief opinion in which the constitutionality of general regulations of hours of labor is almost taken for granted, and the *Lochner* case is not even mentioned, although in principle it is obviously overruled.'

"The deceased Justice Holmes in relation to the mention of the *Lochner* case made in *Adkins* v. *Children's Hospital,* 67 L. ed. 785 (a case on minimum wages to women), said:

" 'I had supposed . . . that *Lochner* v. *New York,* 198 U. S. 45, would be allowed a deserved repose.'

"In addition to the above-mentioned jurists, the following ones consider and are of opinion that the *Lochner* v. *New York* case has been overruled. Judge Learned Hand of the Circuit Court of Appeals for the Second Circuit, Prof. Freund, Prof. Handler of Columbia, Prof. Frankfurter, and Dean Roscoe Pound of the College of Law of Harvard University. To that effect see the article of Prof. Frankfurter entitled 'Hours of Labor and Realism in Constitutional Law,' published in 29 Harvard Law Review, 353, 371, and that of Judge Learned Hand entitled 'Due Process of Law and Eight Hour Day,' published in 21 Harvard Law Review, 495.''

Citation is made of the opinion of the Supreme Court of New Mexico, in the case of *State* v. *Henry,* 90 A.L.R. 805, to support the contrary view, but its reasoning does not convince us.

From an examination of the Puerto Rico law in the light of what we have stated above, the conclusion is readily

reached that the same was enacted by the Legislature within its powers. But it is urged by the appellants that the act is arbitrary because it applies generally to all employees without due consideration to the nature of the employment. In our opinion, appellants are not right.

Reverting to the *Bunting* case, this time to the opinion rendered by the State Supreme Court, we find in it the following:

" 'It is also a maxim of constitutional law that a legislature is presumed to have acted within constitutional limits, upon full knowledge of the facts and with the purpose of promoting the interests of the people as a whole, and courts will not lightly hold that an act duly passed by the legislature was one in the enactment of which it has transcended its power.' The legislature is the exclusive judge of the propriety and necessity of legislative interference within the scope of legislative power. If a state of facts could exist which would justify legislation, it would be presumed that it did exist . . ." *State* v. *Bunting,* 71 Or. 259, L.R.A. 1917–C, 1162, 1165.

And not only might it be concluded here that a state of facts "could exist" which would justify a general law like the one under consideration, applicable to employees such as those of the plaintiff mercantile partnerships, but also in our opinion such a state of facts does exist. With regard to this point, the trial court says:

"It is a matter of common knowledge that the custom has been introduced in this island of giving opportunity to persons employed during the daytime to take evening classes. Not only have we established evening schools to teach how to read and write, thus reducing illiteracy which so greatly hinders us in the obtention of political rights, but also schools of manual arts, and high-school and university evening courses. A person who only works 8 hours a day is physically and mentally in a better condition to study in the evening in a school or university and thus extend his knowledge of his art or trade, or to study a profession, than one who works 10 or 12 hours daily. It is likewise generally known that physical or mental fatigue constitutes a handicap to study. This consideration alone, apart from the attendant health reasons, would be sufficient for a reasonable person to find in the Act of August 7, 1935, the purpose

to promote the public welfare. In other words, it can not be said that in reducing the working day to 8 hours, the Legislature acted unjustly or arbitrarily, and this being so, the legislation falls under the police power and is within the scope of paragraph 10, section 2 of the Organic Act which reads thus:

" 'Nothing contained in this Act shall be construed to limit the power of the Legislature to enact laws for the protection of the lives, health, or safety of employees.' "

The act attacked not only tends to promote and secure the welfare of the employees, but also that of the general public.

Eight hours of work of a healthy, happy, and strong employee, who is continually learning and feels satisfied within the system of social justice in which he lives, yield more than ten or twelve hours of work of that same employee, when feeling exhausted by the excess of his effort, or vexed by the curtailment of liberty that such a prolonged confinement implies, or discouraged and resentful as he considers himself the victim of a system clearly discriminatory against him—a discrimination so long existing that it seems natural and just, and necessary in order to prevent order and social economy from being disturbed.

As to the general public, only narrow-minded persons can fail to perceive the importance to their welfare of being served by employers and employees who act by first serving their mutual interests and by respecting and helping each other.

Experience shows that when these laws are accepted and applied in good faith by employers and employees, business does not suffer; on the contrary, the fair profits increase and a situation of mutual confidence and sincerity arises, which effectively contributes to the maintenance of human dignity and to the public welfare.

It is true that in many cases the spare time is spent in idleness engendering vice, or in vice itself, and the employee then, instead of bettering his condition, degenerates. But

that is the exception rather than the rule. Progress generally is harmonious in human society, and when the latter reaches a stage in civilization which permits the adoption of laws like the one now under consideration, it already has religious, recreative, and cultural organizations well prepared to give to employees the opportunity to spend their spare time in furthering their physical, intellectual, or spiritual progress. And liberal employers are the ones which make the greatest efforts to properly support those situations and to guide their employees towards them.

Justice, or the rendering to every man his due, constitutes the most firm and everlasting basis of social welfare,. and when the legislature inspires itself in it and enacts laws which are within its powers and clearly tend to insure such welfare, the constitutionality of said laws must be vigorously sustained by the courts, because they are within the letter, vivified by the spirit, of the Constitution. It was not a class government, nor a government based upon privilege, that the Constitution created. It was a government of the people, by the people, and for the people that was consecrated by it.

Nor is the law unconstitutional as class legislation. ''No arbitrary discrimination is made between persons employed in commercial and industrial establishments and in other lucrative businesses, and those not engaged in such businesses,'' correctly said the district judge in his opinion filed, and he added: ''The Oregon statute, the constitutionality of which was upheld by the Supreme Court of that State and by the Federal Supreme Court in the case of *Bunting* v. *Oregon,* as we have seen, was worded similarly as our own statute, and it was not held that it contained such discrimination. Besides, our Legislature, in passing the attacked law, must have been aware of the tendency existing in all lucrative businesses to obtain from the worker or employee the highest possible benefit, while the incentive of profit is lacking.''

[3] In our opinion, the constitutional principle of the distribution of governmental powers was not violated by the fact that the Legislature authorized the Commissioner of Labor, with the approval of the Governor, to determine what constitutes an "emergency," an "extraordinary event," and a "special circumstance" for the purpose of the temporary suspension of the act.

In the case of *Hampton & Co.* v. *United States*, 276 U.S. 394, 405, the Supreme Court said:

"The well-known maxim *'Delegata potestas non potest delegari,'* applicable to the law of agency in the general and common law, is well understood and has had wider application in the construction of our Federal and State Constitutions than it has in private law. The Federal Constitution and State Constitutions of this country divide the governmental power into three branches. The first is the legislative, the second is the executive, and the third is the judicial, and the rule is that in the actual administration of the government Congress or the Legislature should exercise the legislative power, the President or the State executive, the Governor, the executive power, and the Courts or the judiciary the judicial power, and in carrying out that constitutional division into three branches it is a breach of the National fundamental law if Congress gives up its legislative power and transfers it to the President, or to the Judicial branch, or if by law it attempts to invest itself or its members with either executive power or judicial power. This is not to say that the three branches are not co-ordinate parts of one government and that each in the field of its duties may not invoke the action of the two other branches in so far as the action invoked shall not be an assumption of the constitutional field of action of another branch. In determining what it may do in seeking assistance from another branch, the extent and character of that assistance must be fixed according to common sense and the inherent necessities of the governmental co-ordination.

"The field of Congress involves all and many varieties of legislative action, and Congress has found it frequently necessary to use officers of the Executive Branch, within defined limits, to secure the exact effect intended by its acts of legislation, by vesting discretion in such officers to make public regulations interpreting a statute and directing the details of its execution, even to the extent of providing for penalizing a breach of such regulations. *United States* v. *Gri-*

*maud,* 220 U. S. 506, 518; *Union Bridge Co.* v. *United States,* 204 U. S. 364; *Buttfield* v. *Stranaham,* 192 U. S. 470; *In re Kollock,* 165 U. S. 526; *Oceanic Navigation Co.* v. *Stranaham,* 214 U. S. 320.''

Judicial proceedings are generally slow. The Legislature itself went as far as it could in the matter of legal definitions. It was not possible for it to determine in advance the existence of the extraordinary situations which might arise. Its common sense suggested that governmental coordination would be more efficient and practical by intrusting that power to the executive rather than to the judicial department, and it did so. The right of citizens to resort to the courts in proper cases was not thereby impaired.

Lastly, we wish to state, although the objection seems to have been waived, as it is not discussed in the brief of the appellants, that we do not think that the law in question violates section 34 of our Organic Act because its title makes no specific reference to the penalty provided in section 6 of the act.

The purpose of that constitutional prohibition, as stated by the Supreme Court of the United States speaking through Mr. Justice Field in the case of *Louisiana* v. *Pilsbury,* 105 U.S. 278, 289, is ''to prevent the practice, common in all legislative bodies where no such provision exists, of embracing in the same bill incongruous matters, having no relation to each other, or to the subject specified in the title, by which measures are often adopted without attracting attention, which, if noticed, would have been resisted and defeated. It thus serves to prevent surprise in legislation. But it was not intended to forbid the union of several different provisions in the same bill, if they are germane to the general subject indicated by its title.''

And this Supreme Court, in the case of *People* v. *Arrocho,* 34 P.R.R. 809, cited and applied the following doctrine as summarized in Ruling Case Law, thus:

''An act is not unconstitutional because more than one object is contained therein where the objects are germane to the main subject,

or they relate directly or indirectly to the main subject, and have a mutual connection with and are not foreign to the subject of such act, or when the provisions of the act are of the same nature and come legitimately under one subject.'' 25 R.C.L. 844.

''Since a statute may include all matters germane to the general subject, it may include all means which may fairly be regarded as in furtherance of and necessary or appropriate to the accomplishment of the objects that are fairly included within the general subject. An act may contain many provisions and details for the accomplishment of the legislative purpose, and if they legitimately tend to effectuate that object the act is not contrary to the constitutional provision.'' *Id.* 846.

Act No. 49 of 1935, which was enacted to regulate the working hours of certain employees, contains restrictive provisions. Those provisions require a penal sanction not in conflict with either the letter or the spirit of the law, and the same can not be considered as a subject different from that expressed in the title, but rather as accessory or necessary to the accomplishment of the objects that are fairly included within the general subject.

Therefore, as none of the grounds of unconstitutionality alleged exist, the judgment appealed from must be affirmed.

Mr. Justice Wolf and Mr. Justice Córdova Dávila took no part in the decision of this case.